NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0446n.06

No. 09-2126

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 01, 2011*

LEONARD GREEN, Clerk

AUTO INDUSTRIES SUPPLIER
EMPLOYEE STOCK OWNERSHIP
PLAN (ESOP),

       **Plaintiff,**

SNAPP SYSTEMS, INCORPORATED,
a Delaware Corporation,

       **Defendant/Third Party
       Plaintiff-Appellant,**

v.

FORD MOTOR COMPANY;
SUSAN E. KOBET, individually;
DIANE S. MARCHESE, individually;
CARMEN ZIRLES, individually;
JEFFREY D. COLLINS, individually,

       **Third Party Defendants-Appellees.**
_____/

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE: SUHRHEINRICH, MOORE, and COOK, Circuit Judges.

**SUHRHEINRICH, J., Circuit Judge:** In this commercial dispute, Plaintiff-Appellant

SNAPP Systems, Inc. ("SNAPP") appeals from the judgment and orders of the district court

granting summary judgment to Third-Party Defendant Ford Motor Company ("Ford") on SNAPP's

breach of contract and tortious interference claims and dismissing the case. We AFFIRM.

**I. Background**

-1-

## A. Business Relationship

SNAPP and Ford's business relationship began in 1991 and ended in 1999. SNAPP initially supplied computer software to Ford, which SNAPP purchased directly from manufacturers and then sold to Ford. Over time, SNAPP began also to supply Ford with "industrial materials," also known as "low end commodities," (LOEs), such as safety equipment. The parties' purchasing arrangements are found in the three contracts at issue: (1) the 1995 Framework Agreement, as amended in 1996, (2) the 1998 Master Equipment Lease Agreement ("MELA"), and (3) the 1999 Transition Agreement.

The three agreements contained the following pertinent provisions. The Framework Agreement provided that SNAPP would perform purchasing services for Ford for certain commodities, primarily related to computer and information technology. SNAPP would purchase the covered commodities from a variety of suppliers and then resell them to Ford. In return, SNAPP was to be compensated for these services by: (1) a "mark up" on the price to Ford – generally 5.5%, but subject to variation on particular purchases; and (2) 50% of the "negotiated savings" that SNAPP achieved on each transaction. The cost savings to be shared were defined as the difference between Ford's pre-SNAPP price or the first price a supplier quoted for a commodity ("Base Price"), and the price that SNAPP actually paid for the commodity ("SNAPP Cost"). Pursuant to these provisions, the price Ford was to pay for the commodities acquired by SNAPP was the sum of SNAPP's costs, the mark-up, and one-half of any savings.

The 1996 Agreement extended the Framework Agreement for an additional three years. It added provisions stating that the "the standard mark-up price structure is intended to return to SNAPP a target 1.75% net profit before tax and cost savings." The parties agreed that "[s]tandard

mark-up prices may be adjusted for the following quarter, either up or down or mutually agreed to manage the standard return to 1.75% total net profit."

The 1999 Transition Agreement was a three-month agreement, executed at the end of the 1996 Amendment to govern the wind-down of the parties' business relationship. It provided that SNAPP would continue to provide purchasing services for certain commodities during the three-month term (this included four distinct types of transactions) and that Ford would pay the price invoiced by SNAPP for certain transactions, SNAPP's operating costs during the term of the Agreement, and a 2% profit on orders placed during the Agreement.

The Transition Agreement also gave Ford the right to audit SNAPP's books and records to confirm the amount claimed under the Agreement. Ford requested an audit, but SNAPP refused to allow one.

According to SNAPP, the parties managed the financial aspects of the complex relationship through weekly, monthly, quarterly, and annual accounting reports regarding the parties' joint data; and by utilizing project summaries, cost savings reports, and financial reviews.

**B. Litigation Relationship**

In 2003, Auto Industries Suppliers Employee Stock Ownership Plan ("ESOP") filed suit against SNAPP alleging breach of fiduciary duty and seeking damages under the Employee Retirement Income Security Act. SNAPP filed a third-party complaint, averring that Ford had breached several contracts under which SNAPP had supplied purchasing services to Ford from 1991 through 1999, by allegedly failing to pay money due under the contracts, and failing to negotiate a contract extension in good faith. Thus began SNAPP and Ford's litigation relationship.

In addition to the breach of contract claims (Count 2), SNAPP asserted thirty-three other counts in the 619 paragraph third-party complaint. These included breach of a partnership or joint venture agreement (Count 1); nine RICO counts (Counts 7-15); fraud and silent fraud (Counts 16 and 18); ten counts of federal and state antitrust violations (Counts 20-29); violation of the Uniform Trade Secrets Act and Michigan Sales Representative Commissions Act (Counts 30 and 32); tortious interference (Counts 33 and 34); and ethnic discrimination under 42 U.S.C. § 1981 (Count 35).

Five years of discovery followed. Ford filed motions to dismiss or for summary judgment on each count of SNAPP's complaint except breach of contract. The district court appointed two special masters to recommend dispositions, as well as a discovery special master. SNAPP appealed all but one of the recommendations by the special masters on the dispositive motions, and the district court dismissed every count of SNAPP's third-party complaint except breach of contract. Of those rulings, SNAPP has appealed only the dismissal of its tortious interference claims.

At the heart of this appeal is the parties' wrangling over discovery of SNAPP's damage claims. Ford served interrogatories 15 and 16 seeking details of SNAPP's damages. Interrogatory No. 15 provides:

> State the maximum amount of damages, in a total sum, that you are seeking in this lawsuit against Defendants and specify:
>
> > a. your method for calculating these damages (including non-economic damages);
> >
> > b. each and every category of damages for which you are seeking recovery in this lawsuit;
> >
> > c. the amount of damages for each category identified in response to subsection (b) of this Interrogatory;

d. *the documents relied upon in making your damages calculations*; and

e. describe all steps you have taken to mitigate your alleged damages claimed in this lawsuit.

(R. 485-12 (emphasis added))

Interrogatory No. 16 provides:

Identify the name, address, and telephone number of any and all persons you expect to call to testify at trial, including any rebuttal or impeaching witnesses whose testimony can reasonably be anticipated before trial and for each, state the following:

a.) the subject matter on which the witness will testify;

b.) *the substance of his or her testimony*;

c.) *the relevant facts known by the witness*;

d.) whether the witness was an expert witness, and

e.) whether the witness has been paid or has been promised to be paid or been offered compensation for any consultation, testimony, consideration, activity, Or report, arid [sic] if so, the amount of such payment and/or promised payment.

(R. 485-12 (emphases added))

On December 2, 2004, Ford filed a motion to compel answers to these interrogatories. (R. 61, Ford's Motion to Compel, Dec. 2, 2004) At a conference with the discovery master, SNAPP represented that its damages analysis would be provided through expert witnesses. As a result, Ford withdrew its motion. (R. 593, Order Denying Motion for Reconsideration, March 9, 2009, at 3)[1]

_____

[1]SNAPP now denies making the representation, but the discovery master recalled the discussion. (R. 485-4, Ex. 3, Trans. Aug. 30, 2005, at 16) ("[Y]ou said, look, they're just making work for me, they're going to get my damages in the expert report is where they're going to get them. That's what I recall. . . .").

On July 29, 2005, SNAPP served the first expert report of Thomas Frazee. (R. 206-5, Frazee Report, July 29, 2005) Frazee characterized it as "preliminary," and estimated damages at $83 million.[2] SNAPP did not provide supporting documents and stated that other unidentified damages would be presented through lay witnesses. In turn, Ford filed another motion to compel answers to Interrogatories 15 and 16. The discovery master granted this motion. (R. 322, Report and Recommendation, Apr. 6, 2006)

In response to the discovery master's order, SNAPP filed a supplemental interrogatory response. (R. 485-12, SNAPP's Supplemental Resp., June, 9, 2006) In this document, SNAPP claimed over $80 billion in damages. Again, little detail or explanation is provided for each type of damage claimed. (R. 485-12 at 6-8)

On July 11, 2006, Ford filed another motion to compel proper responses. (R. 363, Ford's Second Mot. to Compel, July 11, 2006) The special discovery master granted this motion, this time ordering SNAPP to provide detailed damages information:

> SNAPP shall supplement its answer to Interrogatory No. 15 from Third-Party Defendants' First Set of Interrogatories and Request for Production of Documents as follows:
>
> 1. SNAPP shall supplement its answer to Interrogatory 15(a), (b), and (c) by stating the maximum dollar amount of total damages sought by providing all formulas, data, or information, and the source of any variables, amounts, or other factors relied upon, to calculate the dollar amounts of damages stated in answer to subparagraph (a) and each of the twelve categories included by SNAPP by subparagraphs (b) or (c) on pp. 6-8 of SNAPP Systems, Inc.'s Response to Ford Motor Company's Interrogatory Nos. 15 and 16. *In its description of methodology, SNAPP shall include a complete description of how each figure was determined, including the calculations, and specific documents relied upon.*

---

[2]This report was not filed in the district court.

2.      *SNAPP shall supplement its answer to Interrogatory 15(d) by identifying each document relied upon for each category of damage* by listing each document in the same portion of the supplemental response that the specific damage category is discussed.  *Each document is to be individually identified and listing groups of documents is not permitted.*  If an identified document has not been previously provided to Third Party Defendants, SNAPP shall provide a copy of the document to Third Party Defendants' counsel with its supplemental answers.

C.      SNAPP shall supplement its answer to Interrogatory No. 16 from Third-Party Defendant's First Set of Interrogatories and Request for Production of Documents as follows:

1.      SNAPP shall supplement its answer to Interrogatory No. 16(a) by *fully and completely specifying the subject matter on which each witness will testify, including the category of damages to which the witness will testify.*

2.      SNAPP shall supplement its answer to Interrogatory 16(b) and 16(c) *by specifying the substance of each witness's testimony within each specific category (or categories) of damages, any calculations performed by the witness, and facts and specific documents relied upon by the witness in preparation of damage calculations.*  If the witness is an expert witness, SNAPP may incorporate the expert's report by reference.

(R. 395, Report and Recommendation, Sept. 12, 2006, at 2-3 (emphases added))

SNAPP appealed this ruling to the district court.  The district court overruled SNAPP's objections, and expressly adopted the special discovery master's September 12, 2006, Report and Recommendation.  (R. 454, Order, Feb. 16, 2007)

On April 2, 2007, SNAPP filed another supplemental response to Interrogatories 15 and 16.  (R. 485-15, SNAPP Supplemental Resp., Apr. 2, 2007)  In this document SNAPP claimed $22.9 billion in damages, but did not provide the information ordered by the special master and the district court.

On April 4, 2007, following a pretrial conference, the district court ordered SNAPP to file "a description of the damages claimed in detail in tabular form." (R. 472, Trial Scheduling Order, Apr. 9, 2007, ¶8)

On May 11, 2007, Ford filed its first motion to strike SNAPP's damages based on SNAPP's allegedly deficient responses to Interrogatories 15 and 16. (R. 485, Ford Motor Company's Mot. For Contempt and Mot. to Strike SNAPP's Damage Claims and Evidence, May 11, 2007) At a status conference on May 18, 2007, which "was originally set as a day to set the trial date," the court again ordered SNAPP to disclose the basis for its damages. (R. 612, Trans. May 18, 2007, at 2)

> **THE COURT:** I'm satisfied that part of the confusion here – and it may not be confusion. It's my inability to fully understand this case. It's probably because I bifurcated liability and damages so I have not seen the verdict form on damages, I have not seen the instructions on damages, and I have not seen the damage report. But I'm going to ask for comment, but I must say a $7 billion damage claim seems to me in the circumstances, well, cause for some pause.
>> *So it would be helpful if we sort of started over again on this exercise to understand the scope of this case or at least supplement the papers that have been filed by a list of witnesses who will testify as to the dollar amount of damages, a full report on how the damage amount is arrived at, and a new verdict form to correlate the damages*, the damages sections of the verdict to the liability section and have instructions on damages.

(R. 612 at 4-5 (emphasis added)) The accompanying order states as follows:

> On May 18, 2007, the Court held a status conference to chart the further course of the case and set a trial date. Because of the uncertain nature of plaintiff's proofs on damages, further proffers of proof are required before the case can be set for trial. To assure the Court's adequate understanding of the nature of the proofs on damages, plaintiff shall promptly lodge with the Court:
> . . . .
>
> 3. A complete analysis of the damages claimed correlated to the liability and damages questions as reflected in the revised draft verdict form. . . .
>
> 4. A list of the witnesses who will be called in support of the damage claims.

(R. 489, Order, May 21, 2007 at 12)  The order also noted Ford's pending motion to strike SNAPP's damages claims and evidence, but felt "the motions can better be dealt with after plaintiff has made the proffers required . . . above," and deferred ruling.  (*Id. at 2*)

In response to this order, SNAPP filed a damages analysis which claimed $5.1 billion in damages.  (R. 501-3, Analysis of SNAPP's Damages Claim, June 20, 2007)   This analysis divided the damages claimed into three categories–based on the 1995 Frame Work Agreement, the 1998 Master Equipment Lease Agreement, and the 1999 Transition Agreement.  Again, the document did not identify the witnesses who would testify to the dollar amount of each component of the alleged damages or how the amounts had been calculated.  Instead, it stated that "this Court has correctly noted that this dispute is in some respects a claim for an accounting. . . . [and that] [m]any of the contractual aspects of SNAPP's claims under the Frame Work Agreement can be resolved by a judicially-supervised accounting after the jury resolves certain factual disputes."  (*Id.* at 1)

At a status conference on June 22, 2007, the trial court stated on the record:

> **THE COURT:**  Okay.  The last time we were here was on May 21st, and at that time I asked SNAPP to file a revised draft of verdict form, which they did; a draft of the jury instructions on damages; a complete analysis of the damages claimed correlated to the liability and damage question as reflected in the revised draft verdict form, I'm not sure that that's been done; and a list of witnesses who will be called and some other things.

(R. 511-4, Trans., June 22, 2007 at 2)

The court identified three problems:

> [T]he verdict form doesn't correlate to the exhibit.  That's number one.
>
> Number two, there's nothing in this that shows how you reach those figures, the analytical base for the figures, and number three, I don't know who these will call witnesses are.

(R. *Id*. at 3)

On July 9, 2007, SNAPP filed "SNAPP's First Amended Damages Witness List." (R. 505) In this document SNAPP identified fourteen "will call witnesses" (and two "may call lay witnesses"), and described the personal knowledge of each witness in general terms. It did not identify any source documents (other than the three contracts at issue) connected to a particular witness.

On August 1, 2007, the district court held a hearing on Ford's motion to strike damages claims. The following colloquy, which typifies many such dialogues in the case, took place:

> Now we will go to the first claim and that's whether or not SNAPP has offered sufficient proof of damages to allow the case to go forward, and I'm going to walk through the verdict form.
> The verdict form starts with the 1995 framework agreement as amended in 1996. I take it that that claim is as follows: SNAPP's right to a 1.75 percent profit. Now–and the verdict form for that was Part 1A. I want to know what figure SNAPP anticipates the jury finding for question 1B, the damage figure under 1B. What figure?
> **MR. FINK:** Your Honor, may I approach? We have brought in--
> **THE COURT:** No, you tell me from there. I don't want the chart. I want you to tell me–you answered yes. How much of a credit is SNAPP entitled to? What figure do you anticipate the jury placing in there?
> . . . .
> **MR. FINK**: It's $232,900,000.
> **THE COURT:** So that, therefore are your damages for breach of Paragraph 4.1 of the 1995 framework agreement as amended on August 9th, 1996?
> **MR. FINK:** That's correct, your Honor.
> **THE COURT:** That's your damages.
> **MR FINK:** That's correct, your Honor.
> **THE COURT:** So that's 1.75 percent of the total business that Ford did with you?
> **MR. FINK:** Well, Your Honor, if I may, If I may--
> **THE COURT:** Just yes or no.
> **MR. FINK:** Yes, it – Your Honor, the problem with just answering yes or no to that question is that this is just a gross number for which Ford gets a credit.
> **THE COURT:** No, I want to know what the damage figure is, Mr. Fink, for breach of Paragraph 4.1 of the 1996 Amendment because that's what the jury will be

asked to find. You are claiming breach of Paragraph 4.1 is my understanding, and I want to know what dollar amount you are asking from the jury.

**MR. FINK:** And, Your Honor, what we did, consistent with what we have discussed with the Court before in the previous pretrials, is we set it up as debits and credits.

**THE COURT:** No, I'm not interested–you didn't set up–you didn't agree with anything with the Court. Your claim–first of all, let me ask you a different question. What was the term of the 1995 framework agreement?

. . . .

**MR. FINK:** It was a, it was a one-year agreement, but it was amended in 1996.

**THE COURT:** No, what was its term, the 1995 agreement? How long was the agreement for? Was it an indefinite period or a fixed period?

**MR. FINK:** Well, Your Honor, it was a fixed period. It's identified in 1.6. The term is a period of one year, which would renew automatically.

. . . .

**MR. FINK:** Well, the amended agreement expired September 30, 1999.

**THE COURT:** All right, 9-30-99. Now, is it your position that on 9-30, 1999 [sic] under the agreement you were to look at the aggregate business that had been done during the term of the agreement and see whether or not SNAPP made 1.75 percent net profit on a cumulative basis and if it didn't Ford was obligated to make up the difference?

**MR. FINK:** Yes, Your Honor. They were to adjust the – it was to achieve an ongoing, it said ongoing 1.75 percent, yes.

**THE COURT:** Just listen to me.

**MR. FINK:** The answer is yes.

**THE COURT:** The agreement ended September 30, 1999. It is your position that there was to be a look back and as if on that date for the whole period of the agreement you had not made 1.75 percent Ford was to pay you the difference?

**MR. FINK:** Yes.

**THE COURT:** And there wasn't to be an accounting at the end of each year?

**MR. FINK:** No, there wasn't an accounting at the end of each year.

**THE COURT:** Was there to be a contractual obligation?

**MR. FINK:** To account each year? No.

**THE COURT:** No. Is there any document which shows that you were keeping a running tab on the amount of business to see whether you hit the 1.75?

**MR. FINK:** Yes, there is, Your Honor.

**THE COURT**: What's the exhibit number?

**MR. FINK:** Well, it's this document right here.

**THE COURT:** What is its exhibit number?

**THE FINK:** I don't know. It's called a GAP chart.

**THE COURT:** No, I don't want any chart. I want to know if there was a document generated in the ordinary course of business that is part of the business records of either Ford or SNAPP.

**MR. FINK**: Yes, Your Honor. What happened was every quarter–it says here. It says here they should be quarterly. They met quarterly, and at the quarterly meetings beginning in 1997 they would meet and discuss the profit target and where they stood, and they exchanged these documents.

**THE COURT:** No, no, that isn't – come on, come on, come on. No, no. There is no--

Did on September 30, 1999 or shortly thereafter SNAPP compute the amount of the deficit and tell Ford how much it was owed?

**MR. FINK:** Well, yes, actually before that date SNAPP had told Ford that there was a deficit in the profit target and SNAPP – Ford had told– SNAPP had told Ford there was a deficit and Ford as part of the negotiations had insisted that SNAPP drop that amount. SNAPP did not drop that amount.

**THE COURT:** Well, okay. Assuming SNAPP did not, what is the net amount owed by Ford according to SNAPP on September 30, 1999 pursuant to Paragraph 4.1 of the 1996 amendment?

**MR. FINK:** Your Honor, I am going to have to consult for a moment because we haven't been working with the net amount. We have been working with credits and debits.

**THE COURT:** Well, excuse me, sir, your working with credits and debits is not consistent with the orders of this Court and Special Master Sankbeil relating to your requirement to provide an itemization of your damages. It is insufficient.

**MR. FINK:** Your Honor, we --

**THE COURT:** Did you hear what I said?

**MR. FINK:** I did, Your Honor, and I'm going to respond to it.

**THE COURT:** And nothing presented to the Court satisfies your obligation to provide a detailed analysis of the net amount due SNAPP under Paragraph 4.1 of the 1996 amendment assuming there was a contractual obligation of Ford to pay – assure that you received a 1.75 net profit before taxes and cost savings. There is nothing, nothing in any of this documentation that deals with that.

**MR. FINK:** Your Honor, so the Court will understand why it's presented in this form--

**THE COURT:** No, I'm interested in why it was presented in this form. I'm talking to you, Mr. Fink, about your obligations under orders of the Court, and you chose to do it your way, but your way is not consistent with the orders of the Court, including the last order.

**MR. FINK:** Your Honor, we do have a – Your Honor, if the Court will give me a minute. I can get the number. I can't do it in my head because we had presented it this way for what we thought was simplicity truthfully. We really thought this would be an easier way to present it.

**THE COURT:** No, no. Please, Mr. Fink, those are all words. *There's no way on this record that you have anything that you can present to a jury or witness who can give that computation and say this is what we want the jury or a witness who can give that computation and say this is what we want the jury to return a verdict in favor of SNAPP based upon a breach of Paragraph 4.1 of the 1996 Amendment, and unless I get within 30 days a complete analysis in satisfactory form to explain to a jury the justification for the amount of damages claimed by SNAPP against Ford under Paragraph 4.1 of the 1996 Amendment, this case will be dismissed for failure to be forthcoming in discovery and comply with the orders of the Court to provide an analysis of the damages claimed by SNAPP for breach of contract against Ford.*

(R. 609, Trans., Aug. 1, 2007, at 4-11 (emphasis added))

Later in the hearing, the court stated: "As far as I'm concerned, there has been an utter failure of SNAPP to follow the September 12, 2007 report and recommendation and utter failure to follow the Court's instructions of May 21, 2007 as well as June 22, 2007. This case is at risk of being dismissed." (*Id.* at 29) Mr. Fink asked if the court was "holding that all damages must be proved through expert testimony? We will follow the Court's instructions." The Court responded that it "imagine[d] it has to be. I don't know. I want to see your damage studies. I mean this is the first time I have ever seen a case of this magnitude with this kind of a damage study." (*Id.*) Mr. Fink acknowledged that the case was now no longer complex, but a "simple contract claim, we did what were supposed to do and they didn't pay us. It's that simple." (*Id.* at 30) The Court responded: "First of all, you haven't showed the amount they owe you." (*Id.*) The court directed SNAPP to file a detailed damage study within thirty days which was in compliance with the court and special master orders.

In response to this order, SNAPP submitted the second report of Frazee, entitled "Expert Report Prepared by Thomas A. Frazee." (R. 513, Frazee Report, Sept. 10, 2007) This report claimed $3.9 billion in damages, with eleven components. The report expressly stated that it

-13-

constituted Frazee's "expert opinion on damages, but is not intended to embody all of SNAPP's proofs of damages at trial." (*Id.* at 1) The report contains a number of exhibits[3], but SNAPP did not otherwise supplement this report with any other witness proffers, affidavits, testimony or other evidence regarding damages.

Ford filed another motion to strike SNAPP's damages claims and evidence. (R. 518, Ford Motor Company's Second Mot. to Strike SNAPP's Final Damage Report, Oct. 5, 2007) On October 19, 2007, the district court ordered SNAPP to file a response to Ford's motion to strike SNAPP's final damage report. (R. 519, Order, October 19, 2007)

On November 5, 2007, SNAPP filed its Response in Opposition to Ford's Motion to Strike the September 10, 2007 Summary Prepared by Thomas A. Frazee. (R. 520) Attached as Exhibit 1 is a 264-page document entitled "Comprehensive Description of How SNAPP Intends to Present its Damages In the Context of the Frazee Expert Damages Study." (R. 520-3)

---

[3]These include: (A) Frazee's curriculum vitae; (B) Summary of SNAPP's Damages; (C) SNAPP's Accounting for Receipts and Disbursements From 1992 to September 1999 Including Reconciliation to Original Project Summaries; (D) Cumulative Ford Payment Allocation; (E) Summary of SNAPP's Damages Under 1.75% Profit Agreement; (F) Leaked Revenue 4Q1996-3Q1999; (G) Savings Sharing-Cumulative Through 9/30/99; (H-1) Actual Savings by Supplier; (H-2) Ford Interoffice Letter dated April 11, 1997 regarding SNAPP, describing SNAPP "as a 'single point of contact' with about 4,000 sub-suppliers" and providing an "Overview of SNAPP"; (I) Interest on Late Payments from Ford; (J) Late Charges Due on Payments Under Master Equipment Lease Agreement; (K) Lost Interest Income from Lease Program Agreement; (L) SNAPP Damages Under 1999 Agreement; (M) Lost Mark-up on Certain Type II Transactions Under the 1999 Agreement; (N) Outstanding Ford Accounts Receivable Due to SNAPP; (O) Damages Caused by Ford's Failure to Negotiate in Good Faith; (P) Documents Reviewed (by SNAPP); (Q) This document is not titled, but according to Frazee's Report at 11, it lists "[t]he primary documents supporting this Component of damages" namely the "Savings Sharing" component of SNAPP's damages claim; (R) Memo entitled "Clairification [sic] of Commodities Sourced to SNAPP"; (S) Memo from Ford entitled "IT Products Procurement."

On December 5, 2007, the district court held a hearing "on motion to strike expert's damage report." (R. 608, Trans., December 5, 2007)  The district court remarked in pertinent part:

> *Now, whether there is sufficient evidence to take each of these items to a jury, that's a different question, and whether Frazee is competent to express an opinion as to each of these items based upon his report is problematic.*

(*Id.* at 2 (emphasis added))  The court held that Frazee should be deposed in open court to allow the court to rule on the admissibility of Frazee's testimony.  (*Id.* at 3, 9, 11)  Ford expressed its fear that this procedure would be unproductive because Frazee had simply included numbers given to him by others.  The court responded:

> **THE COURT:** That's fine, and if he doesn't know, then he can't testify.  If he can't justify his figures, then he can't testify.
> **MR. MCINTYRE:** But the point is that their report says they don't intend to prove their damages through Frazee.
> **THE COURT:** Forget that.
> **MR. MCINTYRE:** They intend to introduce it through the laypeople.
> **THE COURT:** Mr. McIntyre, forget that.  The witness who is going to put the figures on the board, the final figures, is Mr. Frazee.  Now, that's a dead certainty.  There may be witnesses who precede him who will testify and then he has to accumulate their figures to get there.
> **MR. MCINTYRE:** But, see, in order for me to understand their damages, I have to know not only just the formula.  They have given us the formula . . . . *We have got some initial documents they attach, but we are told the real work, the underlying data accumulations, the underlying data analysis and crunching, the underlying schedules, the underlying calculation were done by SNAPP people. . . .*
> **THE COURT:** Excuse me.  I don't want to use a vulgarism.  That's all nonsense.  You are entitled to know who those witnesses are in particular and what they are going to say in particular.
> . . . .
> What you do now is take any of these items, just take any one of these items, any major item that you think is speculative and conjectural and lacks support, and *we will have an evidentiary hearing starting with Mr. Frazee and we'll see what he says and then we'll see what proffers there are from the record of their witnesses and the documents to support his figures.*
> . . . .
> . . . I'm telling you that I have a concern that Mr. Frazee's report is speculative and conjectural, and I am not going to let this case go to trial until I'm satisfied that the

speculation and conjecture of the Frazee report is out of it so that there is a legitimate issue over it and it can go to a jury. I don't want to get to a big long trial and at the end dismiss it at the conclusion of the plaintiff's case because they haven't adduced evidence sufficient to go to a jury.

(R. 608 at 5-15 (emphases added))

SNAPP's counsel Mr. Fink in turn asked for a pre-deposition status conference

so that we don't have any misunderstandings that day in terms of what he's preparing. . . . I want to make sure I'm understanding on this record one thing – I think I am, but I want to be clear –and that is that Mr. Frazee will be and is, as we explained, a summary witness who is going to provide --
    **THE COURT:** He is a summary witness? He can't be a summary witness. Mr. Frazee is your summary witness.
    **MR. FINK:** That's what I meant to say, Your Honor, Mr. Frazee is a summary witness.
    **THE COURT:** Yeah.
    **MR. FINK:** Yes, yes, and what I'm saying is as a summary witness in part he will testify, as the Court has explained in a tax situation, some of his testimony will be grounded in evidence that will be presented by others, but he needs to understand that and be prepared to explain what the basis of them is.
    **THE COURT:** *Well, he should know by now what those are and what data they gave him. . . . Because he's the one that put the figures down.*

(R. 608 at 15-16 (emphasis added))

Frazee's in-court deposition took place on January 17, 2008, and February 27, 2008. The court explained at the outset:

    **THE COURT:** All right. One of the issues in this case pretrial is the admissibility of the testimony of Thomas A. Frazee as an expert relating to the damages allegedly suffered by SNAPP. Mr. Frazee has filed an expert report which purports to describe in a comprehensive fashion the damages suffered by SNAPP as a consequence of the alleged breaches of various agreements, et cetera, as found in Exhibit B of his report.
    I'm not sure Mr. Frazee's qualifications have been challenged in Ford's Motion to Strike SNAPP's Final Damage Report, but given the complexity of the report, the analysis of the report by Ford and the response by SNAPP, the Court has scheduled this as a *Daubert* hearing at which Mr. Frazee can be examined and perhaps Ford's –perhaps that way there will be some clarity as to his damage analysis in the cross-examination, Ford's objections to it as being inconsistent, et cetera.

-16-

(R. 607, Trans., Jan. 17, 2008, at 3-4) The court gave SNAPP "one hour of direct to allow him to give a broad view of his analysis." (*Id.* at 4) The court also asked Mr. McIntyre whether Ford challenged Frazee's qualifications as an expert. Mr. McIntyre responded that he was "under the assumption that we were ordered to come and take a deposition of Mr. Frazee. I have not yet filed a *Daubert* motion. . . . So what I'm saying is I haven't approached this as a *Daubert* hearing, and I haven't considered his credentials at this point." (*Id.*) The court replied that they would "just go to his report." (*Id.* at 5)

SNAPP called Frazee. After reviewing his qualifications, Frazee explained that he was originally retained in this matter in mid-2005. Mr. Fink asked: "And over time has the nature of your assignment changed in any significant way regarding this matter?" (R. 607, Trans. at 10) Frazee responded as follows: "*I believe that my, my role has evolved at some level from providing expert testimony and opinions to also now encompassing a role as summarizer or summarization of some of the facts that will be presented by SNAPP.*" (*Id.* at 10-11 (emphasis added)) He expressed his opinion that the methodologies and data used in the report were reliable and acceptable in the accounting profession. (*Id.* at 11) However, he admitted that he did not know the source of the data for most of the damages listed in the report, and had not verified the methods by which the damages were calculated. (*Id.* at 95-96, 104-05) Frazee also confirmed as "a pretty fair summarization" the district court's statement that "I think it's clear that this witness [Frazee] has no person[al] familiarity with any specific item on H-1. . . . . He testified he got this from SNAPP and reformulated it into this tabular form from a spreadsheet." (*Id.* at 116-17)[4]

_____

[4]Exhibit H-1summarized cost savings by SNAPP, but did not state how much of these savings Ford had failed to pay. (R. 513, Frazee Report Sept. 12, 2007, Exhibit H-1) The report allocated the vast bulk of Ford's contract payments to the 1.75% profit target. (R. 513, Exhibits D

Frazee acknowledged that SNAPP paid $70 million for "management services" to PCS, a company wholly owned by Bhagwan Thacker, who was also its only employee. (R. 607, Trans. Jan. 17, 2008, at 172-79) Frazee did not determine whether this was a legitimate expense or a distribution of profits, which would have explained Ford's alleged profit shortfall, but simply accepted SNAPP's treatment of those payments as an expense. (*Id.*)

Frazee's report also added "administrative savings" to the unpaid cost savings, which was supposed to reflect the administrative costs that Ford avoided by hiring SNAPP. (R. 606, Trans. Feb. 27, 2008, at 30-31, 42-43) Administrative savings were not part of the contractual definition of shared cost savings. (*Id.* at 30-32) Frazee admitted that the calculation of the administrative cost savings was performed by SNAPP and that he did not independently verify it. (*Id.* at 42-43, 39)

"Leaked revenues" also formed a major part of SNAPP's claims for both the 1.75% profit target and cost savings. SNAPP defined leaked revenues as Ford's purchase of certain commodities directly from suppliers rather than going through SNAPP. (R. 513, Frazee Report, Sept. 10, 2007, at 8, 11) SNAPP alleged that this practice breached the "desourcing" provision of the 1996 Amendment. (R. 607, Trans. Jan. 17, 2008, at 75-77, 122-26) According to Ford, SNAPP's cost savings for leaked revenues allegedly was based on a single Ford document that reported the cost savings SNAPP had achieved "for a specific type of PC." (*Id.* at 37-38) This percentage was used for all leaked revenue transactions. Frazee admitted that he accepted SNAPP's methodology and calculations without independent verification. (*Id.* at 75-77, 122-26)

The other main component of SNAPP's alleged damages ($1.39 billion) was lost profit due to Ford's failure to enter into a renewed contract at the end of the 1996 Amendment. SNAPP alleged

and G)

that this violated a provision in the 1996 Amendment stating that the parties would "negotiate in good faith" regarding a new contract. (R. 513, Frazee Report, Sept. 10, 2007 at 13-14) In calculating lost profits, Frazee assumed that a new contract would have had a three year term and the same economic terms as the old contract. (*Id.*) He also incorporated Vetter's calculation of lost profits without independent verification. (R. 607, Trans. at 158-59)

At the close of cross-examination on the second day, the court asked SNAPP's counsel if Frazee was "the witness that you are going to offer to testify as to the damages suffered by SNAPP for Ford's breach of various agreements?" (R. 606 Trans., Feb. 27, 2008, at 144) Mr. Fink responded that was correct. Mr. Fink also stated that "This is a witness and the only expert witness, that's correct." (*Id.* at 144-45) The court then asked Fink if SNAPP had given Ford the list of factual witnesses that would testify in support of damages and the nature of their relationship to his report. (*Id.* at 145) Fink replied yes and added that

> we have submitted more than a witness list. We have also . . . provided an exhibit that is entitled Comprehensive Description of How SNAPP Intends to Present its Damages in the context of the Frazee expert damages study, and we describe in some detail the evidence that will be presented. Obviously Mr. Frazee does not have the factual basis for a lot of what he's been testifying to.

(*Id.*) In response, Mr. McIntyre stated that Frazee had received most of the data from other people and Ford wanted to know who those persons were. McIntyre indicated that SNAPP's list of witnesses included along with the final pretrial order "summarily said things like Mr. Vetter will testify regarding damages. . . . It doesn't indicate any documents he's relying on. It doesn't indicate any specifics. It doesn't indicate what underlying information he is going to present, and it doesn't what summaries [sic] he has prepared." (*Id.* at 146-47) Mr. McIntyre added that "there is a witness

list saying they are going to testify as to damages, but our point all along, it's been very uninformative." (*Id.* at 147)

The court remarked that "in order to complete this *Daubert* hearing" Ford was "entitled to examine Mr. Thacker and Mr. Vetter on the discrete portions of the report which they furnished the data." (*Id.* at 148) The court stated that these witnesses would "have to be able to identify the documentary trail" for the data they used to prepare the summary. (*Id.*) The court then stated:

> **THE COURT**: . . . *I'm not going to let this case go to trial until they are examined and we have the foundation for this report.* This report rests on a foundation of Mr. Vetter and Mr. Thacker and documents which they had available to them and documents which support the documents they provided, documentary information they provided Mr. Frazee.
> . . . .
>
> **THE COURT:** Well, I'll tell you, Mr. Fink, unless that happens you don't have a case . . . and you will not go to trial. This report as it stands now rests on a foundation of sand, and until that foundation is transformed into concrete this case is not going to trial, period.
> . . . .
> . . . We now have the witness who is going to summarize the damage calculations. He's got all of these calculations and he says he relies on information provided by third parties. *Standing alone, he can't get this testimony in because it has no factual foundation . . . .*

(*Id.* at 149-50 (emphasis added)) The court directed that Ford would depose Vetter and Thacker in court. (*Id.* at 155) SNAPP's counsel did not request that any other witnesses be examined or claim that any other witnesses were necessary to establish a reliable foundation for SNAPP's damages case. (*Id.*) The district court indicated that it would give SNAPP a chance to re-direct Frazee. (*Id.* at 154)

Prior to their in-court depositions, Thacker and Vetter submitted proffers of their testimony. (R. 534, Proffer of Bhagwan Thacker, Apr. 18, 2008; R. 535, Proffer of Douglas A. Vetter, Apr. 18, 2008) In his proffer Thacker characterized his role:

During the course of the business relationship, Mr. Thacker was responsible for managing all aspects of SNAPP's relationship with Ford. He was involved in all key decisions regarding business processes and business decisions affecting the Ford/SNAPP relationship. He is very familiar with the process by which accounting and business information was created in the ordinary course of business and used by both parties to manage contractual elements such as cost savings sharing, supplier payments, operating expense reimbursements and profit targets during the course of their nine year relationship. All of the data relating to the parties' hundreds of thousands of business transactions resides in several million accounting documents and summaries and audit reports. Those documents were available to Ford in the ordinary course of their business relationship, accepted by both parties as accurate during the relationship, served as the basis for business decisions by both parties. All of those documents were made available to Ford in 2004 and at other times thereafter.

Mr. Thacker is prepared to answer questions on cross-examination regarding the foundation for key aspects of the Frazee Study that are based on his personal experience. *While he can provide testimony about the processes relating to the parties' accounting and provide foundational support for all of SNAPP's business records, he cannot provide specific transactional details from memory. That detailed information resides in millions of accounting records. No single witness can or should be expected to provide that type of detail from memory.*

Mr. Thacker has reviewed the damages information that SNAPP was ordered to provide to Ford. Contrary to Ford's claims, Ford has–more than once–received all the information that it could need to understand the basis for SNAPP's damages.

(R. 534 at 2-3 (emphasis added))

Vetter's proffer states in part:

Mr. Vetter was primarily responsible for providing the factual information Mr. Frazee needed to prepare this study and worked extensively with him to explain the nature of the evidentiary support underlying SNAPP's damages calculations.
. . . .

. . . At the beginning of the engagement, Mr. Vetter worked extensively to bring Mr. Frazee up to speed on the previous damage submissions and the events that had occurred since Mr. Frazee had issued his previous report in August 2005. Fortunately, Mr. Frazee quickly understood SNAPP's calculations as they were based in large part on the methodology proposed by Mr. Frazee in his August 2005 report. *The concept of using summaries of financial results prepared in the ordinary course of business and accepted by the parties as accurate during the business relationship,* adjusted for the "True Revenue," as the primary basis for the 1.75% Profit

-21-

calculations was set forth in the 2005 report. SNAPP's calculations followed this format. Mr. Frazee also developed (in 2005) what has been described as the "debits and credits" approach, in which overall damages were calculated and Ford was then credited for the actual amounts of its payments to SNAPP. This so-called "debits and credits" approach then became the basis for every SNAPP damage submission in this case until the Court determined that a "net" figure for each verdict form component was necessary at the August 2007 hearing. Mr. Frazee, not Mr. Vetter or Mr. Thacker, then determined the new methodology consistent with the Court's orders.

It is clear from these facts that *it is Mr. Vetter who likely played the role of "mechanic," preparing calculations and supplying data to meet Mr. Frazeee's vision of what the "matrix" should be.* . . . Mr. Frazee did not take this information at face value and simply insert it in his report. While Mr. Vetter indeed emailed the final calculations to Mr. Frazee, these figures were based on a collaborative effort to determine the best methods. . . . Mr. Frazee asked many penetrating questions regarding the contractual basis for the damages and the facts and circumstances supporting the breaches, as evidenced by the approximately 300 supporting documents he reviewed in addition to the relevant motions and briefs filed in this case.

(R. 535 at 2-4 (emphases added; footnotes omitted))

The hearing continued on April 22, 23, and May 5, 2008. SNAPP waived its right to redirect Frazee at the outset. Vetter was deposed April 22 and 23. (R. 604, Trans. Apr. 22, 2008; R. 603, Trans. Apr. 23, 2008) Vetter had been a consultant to SNAPP since approximately 1998, and became a director and Treasurer of SNAPP in 2002. He had substantial involvement in the preparation of Frazee's damages report. (R. 604, Trans. Apr. 22, 2008, at 5-7) Vetter testified that his calculations of cost savings by supplier, included in Exhibit H to Frazee's report, encompassed the entire relationship with Ford. (*Id.* at 14-15) In presenting SNAPP's claim for unpaid savings on non-computer-related commodities (referred to as MRO, IPAS or IMPACT commodities), Vetter assumed a savings of 19% on every transaction based on SNAPP's "industry knowledge." (*Id.* at 17-18, 24) Vetter said he had no personal knowledge about that number, that Thacker gave it to him. He could not identify any documents supporting it either. (*Id.* at 17-20)

Vetter also admitted that he had no personal knowledge as to how or when the key documents he used to calculate the cost savings were prepared. He also did not know the source of the information included in those summaries. (*Id.* at 63-65) In calculating cost savings that Frazee incorporated into his report, Vetter added administrative cost savings to the "base price." Vetter stated that Thacker also considered "cost avoidance" as part of SNAPP's cost savings figures, which reflected times when SNAPP allegedly arranged to cancel a Ford debt to a supplier. Again, the definition of cost avoidance was not included in the contract definition of shared cost savings. (*Id.* at 99-100)

Thacker was deposed April 23 and May 5. Thacker is SNAPP's founder and was its sole owner during its contractual relationship with Ford. Thacker admitted that he was not involved in performing the calculations or creating the exhibits included in Frazee's report. (R. 603 Trans. Apr. 23, 2008 at 168-76; R. 602, Trans. May 5, 2008, at 84-87) Thacker stated that Vetter provided all of the specific financial data and information that Frazee incorporated into his report. (R. 603, Trans. Apr. 23, 2008, at 149-50, 167)

Thacker testified that SNAPP and Ford held monthly reconciliation meetings to review the accounts between the companies and that it was not practical to send invoices for the 1.75% profit that SNAPP claimed it was owed. (R. 602, Trans. May 5, 2008, at 105-07, 112-19) At the same time Thacker admitted that, while the monthly reconciliation forms tracked the alleged profit "gap," SNAPP did not calculate its profit claim that way in Frazee's report. (*Id.* at 114-16) Thacker further admitted that, although SNAPP had not done so, it would be possible to document the actual cost savings that Ford allegedly failed to pay by reviewing individual supplier files. (*Id.* at 55-58; R. 603, Trans., Apr. 23, 2008, at 194-201) At one point in his testimony Thacker actually stated that SNAPP

was not asserting that Ford had failed to pay any claims for cost savings submitted by SNAPP. (R. 602, Trans. May 5, 2008, at 74) Other than the 19% estimated average cost savings on MRO commodities (which he based on his "industry experience"), Thacker provided to Frazee only background for the parties' business relationship. (R. 603, Trans. Apr. 23, 2008, at 149-50)

The court ended SNAPP's examination of Thacker because "[t]he lst half hour of your examination of this witness has not contributed one whit to Mr. Frazee's – justifying the factual predicate of Mr. Frazee's report." (R. 602, Trans. May 5, 2008) SNAPP objected, claiming it was being denied its opportunity to present its "full proofs that would support additional foundation for Mr. Frazee's report." (*Id.*) In response, the court said SNAPP could raise the issue if Ford renewed its motion to strike SNAPP's damages, and make a proffer of any additional testimony SNAPP was prevented from presenting. (*Id.* at 214-15)

The court followed up with a written order, which gave SNAPP the opportunity to file another revised expert report. (R. 536, Order, May 6, 2008) It further directed that if Ford renewed its motion to strike, SNAPP could request "another hearing regarding damages, which shall include a proffer regarding the additional testimony it seeks." (*Id.* ¶7)

SNAPP filed a supplemental report of Frazee, which eliminated a damage category, reducing SNAPP's total damages to $1.3 billion. (R. 542, Supplemental Expert Report Prepared by Thomas A. Frazee July 3, 2008) Ford renewed its motion to strike damages. (R. 544, Ford's Renewed Motion to Strike, Aug. 27, 2008) SNAPP in turn expressly disclaimed any need for an additional evidentiary hearing and did not proffer the testimony of any other witnesses besides Vetter and Thacker. (R. 567, SNAPP's Response In Opposition . . . to Ford's Motion to Strike Plaintiff's Damages Analysis and Related Testimony, Oct. 23, 2008, at 30)

-24-

On December 23, 2008, the district court granted Ford's motion to strike. (R. 573, Order Granting Ford's Motion to Strike SNAPP's Damage Analysis and Related Testimony, Dec. 23, 2008) On March 9, 2009, the court denied SNAPP's Motion for Reconsideration. (R. 593, Order Denying Motion for Reconsideration and Offer of Proof, March 9, 2009) The order rejected SNAPP's claim that the court did not give it fair notice of what the court required to prove damages. The court felt "compelled" to set forth the long procedural history (as detailed by Ford in Exhibit 1 to its response to SNAPP's motion). The court stated that the chronology showed that it held Ford's initial motion to strike in abeyance for about one and a half years, giving SNAPP multiple opportunities to present a cogent damage analysis for damages, particularly the factual predicate for its damages.

Next, Ford filed a motion for summary judgment on the breach of contract claim, claiming that SNAPP had no evidence of damages. (R. 575, Ford Motor Company's Amended Motion for Summary Judgment, Jan. 12, 2009) The district court granted the motion. (R. 597, Memorandum and Order Granting Summary Judgment Ford Motor Company and Dismissing Case, May 26, 2009) The court ruled in key part that:

> Here, the Court has found that SNAPP's damage evidence [is] inadequate and has stricken it. . . . The Court also disqualified SNAPP's proposed expert/summary witness, Thomas Frazee, as well as SNAPP's proffered business witnesses, Douglas Vetter and Bhagwan Thacker. The Court also noted that SNAPP failed to provide Ford with the underlying source documents for its claimed damages. . . . Without any evidence of damages, SNAPP cannot make out its breach of contract claim. Summary judgment is therefore appropriate.

(R. 597 at 5)

This appeal follows.

## II. Overview of Applicable Evidentiary Principles

-25-

We begin with a quick review of the key evidentiary rules and principles at issue in this case.

Federal Rule of Evidence 601 states the general rule that "[e]very person is competent to be a witness except as provided in these rules." Rule 602 says that "[a] witness may not testify unless evidence is introduced sufficient to support a finding that the witness had personal knowledge of the matter." Fed. R. Evid. 602.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to . . . determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

Rule 803(6) states:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6). Thus, under Rule 803(6), business records are admissible,

> where a sufficient foundation for reliability is established. Business records are properly admitted under the business records exception to the hearsay rule if they satisfy four requirements: (1) they must have been made in the course of regularly conducted business activities; (2) they must have been kept in the regular course of business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

*Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009) (citing *Redken Labs., Inc. v. Levin*, 843 F.2d 226, 229 (6th Cir. 1988)). This information must be presented through the testimony of a custodian or other qualified witness. *United States v. Moon*, 513 F.3d 527, 544 n.2 (6th Cir. 2008) (citation omitted). *See, e.g., Chavez v. Carranza*, 559 F.3d 486, 497-98 (6th Cir. 2009) (holding that a government document was admissible under Rule 803(6) because the plaintiffs established a foundation through the testimony of a government witness who testified that the document was transmitted from government agents describing events at or near the time the acts took place by someone with personal knowledge of the acts, that the document was kept in the course of regularly conducted business of the government agency, and that it was the regular practice of the agencies to make such records). As we explained in *United States v. Salgado*, 250 F.3d 438 (6th Cir. 2001):

> "Rule 803(6) does not require that the custodian personally gather, input, and compile the information memorialized in a business record." *Weinstock*, 153 F.3d at 276. The custodian of the records need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices. *Id.* (citing *In re Custodian of Records of Variety Distrib., Inc.*, 927 F.2d 244, 248 (6th Cir.1991)). Likewise, "[t]o be an 'other qualified witness,' it is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation." *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 575-76 (6th Cir.1999).

*Id.* at 451-52.

Rule 1006 provides in pertinent part:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place.

Fed. R. Evid. 1006. Summary evidence may be admitted only if:

> (1) the underlying documents are so voluminous that they cannot be conveniently examined in court; (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place; (3) the underlying documents must be admissible in evidence; (4) the summary must be accurate and nonprejudicial; and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*Moon*, 513 F.3d at 545 (citing *United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005)).

Rule 104(a) commits preliminary questions of admissibility to the trial court's discretion. *Bourjaily v. United States*, 483 U.S. 171 (1985); *United States v. Arnold*, 486 F.3d 177, 207-08 (6th Cir. 2007) (Moore, J., dissenting). *See also* Fed. R. Evid. 1101(d)(1). "Rule 104 has been appropriately called a 'jurisdictional' rule; that is, it is an 'allocation of responsibility between judge and jury' for the proper selection of evidence to be used in deciding the case." 21A Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5052.1 (2d ed. 2005) (footnotes and citations omitted). "[G]iving the judge the power to determine preliminary questions of fact is designed to insulate the jury from inadmissible evidence and thus protect the values served by the rules of evidence." *Id.* Similarly, Rule 702 gives district courts a "gatekeeping role" in screening the reliability of expert testimony. *Daubert v. Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The proponent of the evidence has the burden of proof and must lay an appropriate foundation. *See generally Cobbins*, 566 F.3d at 588 (and cases cited therein).

This court reviews the district court's exclusion of evidence, including expert testimony, for an abuse of discretion, even if the exclusion results in the grant of summary judgment to the opposing party. *Meridia Prods. Liability Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) (citations omitted). "A district court abuses its discretion if it bases its ruling on an erroneous view

of the law or a clearly erroneous assessment of the evidence." *Pluck v. BP Oil Pipeline Co.*, – F.3d –, 2011 WL 1794293, at *3 (6th Cir. May 12, 2011) (internal quotation marks and citation omitted). As a result, "we will not substitute our own judgment for that of the district court and will reverse an evidentiary decision only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment." *Id.* (alteration in original) (internal quotation marks and citation omitted).

With these evidentiary ground rules in mind, we turn to SNAPP's numerous challenges to the district court's handling of the case. None has any merit, as we discuss in the next section.

### III. Analysis

### A. Skepticism

SNAPP contends that it had a unique relationship with Ford unlike traditional automotive supplier relationships with original equipment manufacturers (OEMs) that the district court refused to grasp or accept, resulting in multiple erroneous rulings. SNAPP continues that very early in the case, the district court mischaracterized the case as an "unexceptional commercial dispute" and thereafter "seemed unwilling or unable to understand that this was an 'exceptional' relationship and that the 'expectations' of SNAPP were confirmed in written, executed, enforceable agreements such

as the 1995 Agreement." (SNAPP's Br. at 14.)[5] SNAPP also complains about the district court's

"inability to grasp" SNAPP's allegations that Ford did not require bills or invoices.

We do not share this perception. As the recitation of facts above reveals, the district court's

consistent concern throughout the history of this litigation was whether SNAPP had a factual

foundation for its damages claims because SNAPP's unique theory of its case made it impossible

to relate SNAPP's alleged damages to any specific failure to pay by Ford.[6] Rather, the district

court's "skepticism" was not the result of "unwillingness" or an "inability to grasp" the nature of

SNAPP's "relationship" with Ford, but was instead an attempt to verify whether SNAPP could prove

to a jury that Ford had in fact breached its several contractual agreements with SNAPP. In this, the

court was simply performing its "gatekeeping" role under Fed. R. Evid. 104(a) and 702.

## B. Requiring Expert Testimony

---

[5]SNAPP claims the district court's lack of objectivity became apparent in connection with SNAPP's claims for "leaked revenues." The district court stated that "leaked revenue as a item of damages, as far as the Court is concerned, is absolutely off the wall . . . ." (R. 602,Trans. May 5, 2008, at 214) However, when read in context, the court actually said that including so called IPAS commodities in the leaked revenue claim was "off the wall." (*Id.*) The court explained that IPAS were clearly not included in the desourcing provision on which SNAPP relied for its "leaked revenue" claim. (*Id*. at 213-14.) And SNAPP admitted during this hearing that IPAS, MRO and IMPACT commodities were improperly included in the leaked revenue claim. (*Id.* at 174-81, 194-95) Frazee's supplemental report, submitted post-hearing, omitted IPAs, MRO and IMPACT from the leaked revenue claims. This reduced SNAPP's total damages claim from $3.9 billion to $1.3 billion. (R. 542, Supplemental Frazee Report, July 3, 2008, Exh B)

[6]In fact, both Thacker and Vetter admitted that SNAPP's claim for unpaid cost savings was not based on specific cost requests that Ford failed to pay. (R. 602, Trans. May 5, 2008, at 74; R. 604, Trans. Apr. 22, 2008, at 35-36) Thacker also told the court that monthly reconciliation meetings, which generated monthly reports, replaced invoices for profit short falls. (*Id*. at 114-16) When asked by the court if they were available, marked as an exhibit, Thacker replied first, that it had provided examples. When asked about "all of them," Thacker responded that they "could" provide them. (*Id.* at 115)

-30-

SNAPP complains that the district court improperly required it to rely solely on expert testimony and prevented it from presenting its damages through fact witnesses. In support, SNAPP cites one line from the district court's order granting summary judgment, dated May 26, 2009, at the tail end of five years of litigation: "Absent a proper expert analysis on damages, SNAPP cannot support any of its claimed breaches of contract . . . ."

This argument misrepresents the course of proceedings below. Neither the special master nor the district court limited SNAPP to expert testimony. That is, nothing in the court's verbal or written orders placed any such restriction on SNAPP. In fact, fairly early in the litigation during a hearing on Ford's first motion to strike damages, when SNAPP asked the court point blank if expert testimony was required, the district court responded that it "imagine[d] it has to be. I don't know. I want to see your damages studies. I mean this is the first time I have ever seen a case of this magnitude with this kind of damage study." (R. 609 Trans. May 1, 2007, at 29) Significantly, the court added that "[f]irst of all, you haven't showed the amount they owe you." The court then ordered a detailed damages study within thirty days. In response to the court's order directing it to file a detailed damages study, SNAPP opted to submit an expert report–Frazee's second–entitled "Expert Report by Thomas A. Frazee." (R. 513, Frazee Report Sept. 10, 2007) Furthermore, at both the August 1 and December 5, 2007 hearings, the district court made clear that it was also looking for specific documents and witnesses to support the damages claims.

At Frazee's deposition, after it became clear that Frazee lacked a factual foundation for much of his testimony (which SNAPP's counsel acknowledged), the court ordered the depositions of Vetter and Thacker (because these were the individuals Frazee said supplied him with information), in the hope they could provide a reliable foundation for Frazee's testimony as to the various damage

claims. And when this route proved unsuccessful (because Vetter and Thacker also lacked personal knowledge of the underlying proofs), the court gave SNAPP yet another opportunity not only to file a revised expert report but also to request an evidentiary hearing and to submit proffers of any other testimony it wished. SNAPP expressly rejected that invitation to submit additional evidence.

In short, the district court placed no limits on the evidence SNAPP could present to establish an evidentiary foundation for its damages. SNAPP's contention to the contrary is without merit.

## C. Requiring A Summary Witness

Next, SNAPP alleges that on August 1, 2007, over its objections, the district court required it to provide a summary witness to summarize the trial testimony of damages witnesses and admissible evidence, and to do so in "an advance written report summarizing the damages testimony for a trial which had not even begun." (SNAPP's Br. at 20) SNAPP continues that the court allegedly inexplicably ruled in December 2008, that Frazee was not the proper person to serve as the summary witness, despite the August 1, 2007 ruling.

This is not what the court did. The August 1, 2007 hearing was held to address in part Ford's motion to strike damage claims. The court stated at the outset that the first issue was "whether or not SNAPP has offered sufficient proof of damages to allow the case to go forward." Throughout the hearing, the district court attempted to find out *how* SNAPP intended to prove each amount of total damages claimed–the same information Ford sought in Interrogatories 15 and 16. The court told SNAPP that "there's no way on this record that you have anything that you can present to a jury or witness who can give that computation and say this is what we want the jury to return a verdict in favor of SNAPP," and specifically ordered "a complete analysis in satisfactory form to explain to a jury the justification for the amount of damages claimed by SNAPP against Ford under

-32-

Paragraph 4.1 of the 1996 Agreement." In other words, the court required an "advance written report summarizing the damages" because SNAPP had not been forthcoming with its evidence in its responses to Interrogatories 15 and 16 and orders of the special master. The court did not otherwise require SNAPP to present that information in the form of a summary witness or an expert witness.

Although the district court ultimately ruled that Frazee was not a proper summary witness, it did so only after Frazee (as well as Thacker and Vetter) had been deposed. By this point, as Frazee himself stated, his role had "evolved . . . from providing expert testimony and opinions to also now encompassing a role as summarizer" of facts to be presented by SNAPP. And, by then, it was also clear that Frazee was not a proper summary witness because, as the district court observed, he did not personally prepare the summaries himself; had not verified that the information in the summaries reflected information contained in documents already in evidence; could not identify the source of all of the information in the summaries; and could not explain how all the dollar figures were derived. (R. 573 at 10-11) Thus, it is more than a bit disingenuous for SNAPP to suggest that the court "forced" Frazee into a summary witness slot and then arbitrarily refused to allow him to fill that role. Finally, as the district court accurately remarked, Frazee "would essentially be a summary witness of a summary witness . . . . At most, he would be cumulative of Vetter," who was "the only witness who purport[ed] to have knowledge of the information contained in the summaries and underlying documents." (R. 573 at 11)

### D. From Depositions to *Daubert* Hearing to Mini-Trial

SNAPP argues that the court treated the "Ford-controlled" in-court depositions as though they had been SNAPP's presentation of its damages case at trial. SNAPP continues that "[t]he Court

then inappropriately applied the *Daubert* test to the Frazee Study, as if it were a traditional expert report and as if it had been SNAPP's idea to present its damages solely through this expert."

### 1. *Daubert* Label

SNAPP argues that the district court retroactively transformed the in-court depositions into a *Daubert* hearing. Again, the record does not support this assertion. At noted above, the court told SNAPP on August 1, 2007, at the first hearing on Ford's first motion to strike SNAPP's damages, that the purpose of the hearing was to determine if SNAPP had offered sufficient evidence of damages to present to a jury. SNAPP for its part submitted an expert report under Rule 26. After receiving Frazee's Rule 26 report and scheduling Frazee's in-court deposition, the court expressly and repeatedly told SNAPP that the purpose of the hearing was to determine the admissibility of Frazee's damages study. It is difficult to understand how SNAPP could not have understood this to be a *Daubert* hearing since it submitted the report of an expert under Fed. R. Civ. P. 26. SNAPP's counsel acknowledged as much. (R. 606, Trans. Feb. 27, 2008, at 154) ("I presume this *Daubert* hearing continues when we're done with Mr. Frazee with Mr. Vetter and Mr. Thacker.")

In short, SNAPP's argument that it somehow did not understand the purpose of the in-court depositions, despite the district court's constant refrain regarding proof of damages, is utterly implausible, especially since part of Rule 702's requirements is that the testimony be based on sufficient facts or data. Fed. R. Evid. 702. And SNAPP did not object to treating the in-court depositions as a *Daubert* hearing. This argument is rejected.

### 2. Post Hoc Standards

SNAPP maintains that the court allowed Ford to cross-examine the summary witness before a single trial witness had testified and then subjected Frazee's testimony, *post hoc*, to standards

applicable to a fact witness. SNAPP argues that the district court required it to use Frazee as both a summary witness and an expert, and then struck Frazee's entire report as if it were a traditional expert report. Finally, SNAPP claims the court did not give SNAPP an opportunity to offer into evidence all of its damages proofs.

SNAPP improperly attempts to shift the blame to the district court. In the first place, the reason the court ordered the in-court deposition of Frazee was because SNAPP had not properly cooperated during discovery by failing to provide adequate responses to Interrogatories 15 and 16, and to satisfy the numerous orders of the special master and the court requiring it to detail its damages proofs to Ford. Further, prior to the depositions, the court was told that Frazee was "the witness that [SNAPP was] going to offer to testify as to the damages suffered by SNAPP for Ford's breach of various agreements."

As discussed above, SNAPP identified Frazee as an expert witness, and did not object when he was treated as such at the in-court deposition. This treatment was proper, because SNAPP's damages claims were not based on simply adding up allegedly unpaid invoices. Rather, Frazee's report presented a series of aggregate "credits" and "debits" based on assumptions about cost savings, adjustments to earnings, and the like.[7]

But under Rule 702, the testimony must be based upon sufficient facts or data. Because everyone realized during the deposition that Frazee's opinions were not based on his own independent review of the underlying source documents, it was posited that Frazee had somehow "evolved" into a "summarizer" of SNAPP's evidence. However, although Frazee summarized data

---

[7]In fact, Vetter stated in his proffer, this methodology was designed by Frazee, long after the parties' contractual arrangements had ended.

and calculations, as just stated, his report was more than just a summary of data under Fed. R. Evid. 1006 because his report also included data manipulations, adjustments, and calculations using the data presented, and therefore subject to rules governing opinion testimony and expert testimony). *Cf. Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007) (noting that the witness's calculations were better described as a synthesis rather than a summary of charts because the "calculations went beyond the data they summarized and included several assumptions, inferences, and projections about future events," which represented the witness's opinion, rather than the underlying information, and were therefore subject to the rules governing opinion testimony). Moreover, throughout his testimony, Frazee himself indicates that, although he based his testimony on summaries supplied by SNAPP, he employed his methodology based on his experience as an expert in arriving at the set amounts. Accordingly, Frazee's report and testimony were subject to Fed. R. Evid. 702 and *Daubert*. And, as discussed above, Frazee was also not qualified to introduce the documents under Rule 1006.

Finally, SNAPP's assertion that the court never gave it an opportunity to offer into evidence all of its damages proofs is utterly false, for reasons already discussed.

### 3. Advocate for Ford

SNAPP asserts that the district court "appeared to become an advocate for Ford" by aggressively challenging SNAPP's witnesses and making its position on the merits of SNAPP's case abundantly clear. Not so. The district court was simply performing its gatekeeping role under Fed. R. Evid. 104(a) and 702. Rule 104(a) provides that "preliminary questions concerning the qualification of a person to be a witness, . . . or the admissibility of evidence shall be determined by the court." The Advisory Committee Notes to this rule state that, "[t]o the extent that these inquiries

are factual, the judge acts as a trier of fact." Finally, Rule 614(b) expressly authorizes the court to "interrogate witnesses." Fed. R. Evid. 614(b). As the district court told SNAPP, it was simply attempting to establish prior to trial that SNAPP had a case that was submissible to a jury. Anyway, had SNAPP been more forthcoming during discovery in properly detailing its damages evidence in response to numerous discovery orders, the court's gatekeeping activity would have been largely unnecessary.

### 4. Usurping the Jury's Role

SNAPP asserts that the district court "by-passed 'adversarial testing before a jury' in favor of finding facts by a flawed judicial inquisition." This is incorrect. The district court was properly fulfilling the gatekeeping rule assigned to it by Rule 104(a) and 702 of the Federal Rules of Evidence.

### 5. Artificially Limiting SNAPP's Universe

SNAPP alleges that the court did not allow Thacker and Vetter to testify regarding their full range of personal knowledge about damages issues, and essentially ruled these two were SNAPP's sole damages witnesses, despite the fact that SNAPP explained that it would present damages through multiple witnesses. SNAPP also contends that the district court erred by treating the Frazee report and testimony at the *Daubert* hearing as "the artificial universe" of SNAPP's damages evidence.

The district court did not limit SNAPP's damages evidence to Thacker and Vetter. As discussed above, not only did the court not limit SNAPP to expert testimony, after five days of testimony, it asked SNAPP if it wanted to present additional testimony. More fundamentally, prior to these final offers, the court had given SNAPP six other opportunities to disclose its damages

evidence. *See* Order Denying SNAPP's Motion for Reconsideration and Offer of Proof, R. 593 at 3-6 (chronicling history of discovery proceedings).

Equally meritless is SNAPP's other contention that the district court created an artificial universe of SNAPP's damages evidence. Rather, as the record reflects, that was SNAPP's doing, through its steadfast "reticence" to provide the court with a detailed basis for its various damages claims through original source documents and qualified witnesses.

### 6. Penalizing SNAPP

SNAPP claims that the October 3, 2008, Vetter affidavit demonstrated that it would be able to prove with admissible evidence each and every fact underlying Frazee's opinions, obviating the need for further depositions. SNAPP says that the district court inferred that SNAPP was waiving its right to a legitimate evidentiary hearing if the court deemed Vetter's affidavit inadequate, thereby imposing "the ultimate punishment for trying to advance the process to trial through the use of an affidavit proffer." (SNAPP's Br. at 31)

Vetter's October 3, 2008 affidavit could not save SNAPP's case. As the district court held, Vetter was not familiar with SNAPP's record keeping for the relevant documents which were created before he became affiliated with SNAPP. Vetter's reliance was also based solely on what he had been told, not his knowledge of SNAPP's record keeping.

Finally, the dismissal of SNAPP's breach of contract claims is not the result of unfair "punishment" by the district court but the result of SNAPP's failure to (1) obey the orders of the court during the discovery process, and (2) establish that it had the requisite evidence to present a case to a jury.

### 7. Laboratory Experiment

This argument does not merit discussion because it is utterly baseless.

**E. Striking Frazee's Testimony**

SNAPP claims the court erred in striking Frazee's testimony because Frazee properly relied on data found in admissible business records kept in the normal course of regularly conducted business, *see* Fed. R. Evid. 803(6), and that he conducted his analysis according to generally accepted accounting standards and practices. SNAPP also maintains that Frazee's testimony actually met the *Daubert* test.

**1. Reliance on Business Records**

SNAPP contends in its principal brief that

the data compilations relied on by Frazee are not litigation exhibits created after the fact; rather, these project summaries, cost savings reports, and financial reviews were prepared in the ordinary course of business and also were in the record as part of the documents produced by SNAPP and Ford. . . . Moreover, because these reliable, admissible data compilations served as the basis of the Frazee Study, review of the millions of individual, transactional level purchase orders and other documents was not necessary or appropriate.

(SNAPP's Br. at 35-36.)

This argument must be rejected. First of all, even if Frazee had properly relied upon them, SNAPP never identified the witnesses who could lay a proper foundation for these documents in accordance with Fed. R. Evid. 803(6). Frazee admitted that he got his information from Vetter, who also acquired his information principally from project summaries and cost savings reports prepared by the same unknown (or at least unidentified) persons and/or procedures. To reiterate: SNAPP never demonstrated that it could lay a proper factual foundation for its damages through its business records.

Furthermore, because Frazee had no familiarity with the underlying source documents, he was not qualified to testify as an expert under Rule 702, because his expert opinion was not based on "sufficient facts and data." *See* Fed. R. Evid. 702(1). As the district court held:

> Ford argues that SNAPP cannot meet the threshold requirement of *Daubert* and Rule 702 with respect to Frazee's opinions and testimony essentially because Frazee's testimony made clear that he had little, if any personal knowledge of the underlying data used to created [sic] the opinions contained in his report. The Court agrees. As was born out at the hearing, Frazee accepted summaries of data supplied to him by Vetter wholesale and simply used the data, often in the same format sometimes reformatting the data, to prepare his report. Frazee had no personal involvement in the preparation of the data.
>
> . . . .
>
> For instance, Frazee testified that he did not prepare Exhibit Q to his Export Report (attached as Exhibit 5), which is also Exhibit Q to the Supplemental Report. Exhibit Q purports to delineate documents allegedly reviewed and relied upon in formulating SNAPP's cost-savings claim. Frazee testified he did not know who prepared it. 2/27/08 Hearing Transcript at p. 76. At the hearing, counsel for SNAPP said that Exhibit H-1 to the Frazee Report and Supplemental Report . . . clearly sets forth the parameters of SNAPP's cost savings claim. However, Frazee testified that Exhibit H-1 was derived directly from data supplied by Vetter and mirrors Exhibit 14 at the hearing, which was an e-mail and attachment from Vetter to Frazee with the subject heading "revised cost savings schedule." Thus, with respect to SNAPP's cost savings claim, Frazee performed no independent analysis but rather simply took figures supplied by Vetter.
>
> > Ford further notes that Frazee admitted a similar lack of involvement and/or knowledge with respect to every component of his damage analysis:
> >
> > - Frazee admitted that he did no analysis to determine whether SNAPP's cost savings claim related to the Midwest settlement was appropriate and that he did not know anything about the Midwest item other than the fact that it was on Vetter's papers that were given to him. 02/27/08 Tr. at 63:12-15; 63:21, 64:3-5.
> >
> > - Frazee admitted that he accepted SNAPP's calculation of "leaked revenue" without any analysis beyond "talk[ing] to SNAPP about the document." 1/17/08 Tr. at 75:21-77:24.

• Frazee admitted that all of the cost savings information on Exhibit H-1 was provided to him by SNAPP and incorporated into his report with little more than mere formatting changes. Id. at 96:1-12. Frazee had no idea who at SNAPP actually derived the numbers used for Exhibit H-1. Id. at 13-16. Further, Frazee admitted that he had no personal familiarity with any specific item on H-1. Id. at 116:15-25. See also Defendant's Hearing Ex. 14.

• Frazee admitted that he obtained all of the contemporaneous relationship documents used in his Report from SNAPP business people. Ex. 3, 01/17/08 Hr'g Tr. at 117:9-15.

• Frazee admitted that he did not personally prepare Exhibit Q to his Report and did not know who specifically prepared it other than someone at SNAPP. 2/27/08 Tr. at 76:9-24; 78:8-15.

• Frazee admitted that he just incorporated the alleged savings percentage of 38.39 percent in a Nasser memo sent to him by SNAPP into his Report. Id. at 124:3-125:4. Frazee did not undertake his analysis or due diligence to verify this percentage other than just talking to Thacker about Thacker's commodity experience. Id. at 125:6-17.

• Frazee admitted that he incorporated most of the spreadsheet Vetter sent him entitled "Good Faith Renewal Damages" into his Report without doing any analysis of the information other than cross-referencing the numbers for accuracy with other documents provided to him by SNAPP. Id. at 153:16-154:7; see also 01/17/08 Tr. at 158:13-159:9. Compare Defendant's Hearing Ex. 10 with Exhibit O to Supplemental Report, lines 1-3.

• Frazee lifted and accepted the numbers from Vetter's email entitled "Damages Related to Past Due Payments Under the MLA" without further change or analysis to create Exhibit J to Supplemental Report.

• Frazee adopted the total from Vetter's email entitled "Interest benefit under the [Lease Program Agreement ("LPA")] without further change or analysis to create Exhibit K to the

-41-

Report. Compare Defendant's Hearing Ex. 16 with Ex. K to Supplemental Report.

- Frazee admitted that his Exhibit N "summarizes" the contents of Vetter's email entitled "1999 agreement claim – open A/R." 02/7/08 Tr. at 59:22. In fact, other than rounding a few numbers, Exhibit N is identical to the information provided by Vetter, and merely reformatted. Compare Defendant's Ex. 17 with Ex. N to Supplemental Report.

- Frazee admitted that the $5.5 million in alleged damages in Exhibit L, pertaining to the Transition Agreement, is based upon Exhibit N, which in turn was created wholesale from an email attachment from Vetter. 02/27/08 Tr. at 120:16-121:7. Frazee also admitted that he did no independent review or analysis of the underlying purchase orders from which the data in Exhibit N allegedly was compiled. Id. at 121:8-14.

- Frazee admitted that Exhibit M was based on data that was forwarded to him by Vetter entitled "Incompleted' Type II Transactions." 02/27/08 Tr. at 135:10-136:6. Frazee did not change any of the substantive data provided by Vetter, nor did he do any independent verification of the numbers by reviewing the underlying purchase orders. Id. at 136:7-15. Frazee only changed the title of the spreadsheet and the title of the last column, and otherwise incorporated the attachment wholesale as Exhibit M to his Report. Compare Defendant's Hearing Ex. 19 to Ex. M to Supplemental Report.
  . . . .

*. . . Frazee's acceptance of other's work and incorporating it into a report simply does not meet the reliability component necessary for expert testimony . . . . It is not the fact that Frazee did not have personal knowledge of the business record which is important. Rather, it is the fact that Frazee failed to perform any intellectual analysis or review of the underlying source documents (which SNAPP says are its business records) sufficient to qualify him as an expert.* As demonstrated above, Frazee had no actual involvement in the calculations of SNAPP's damages components. Instead, he either did no analysis or accepted the analysis supplied by others, particularly Vetter.

(R. 573 Order Granting Ford's Motion to Strike SNAPP's Damage Analysis and Related Testimony dated Dec. 23, 2008, at 5-9 (emphasis added; footnote omitted)) The district court findings with respect to Vetter's testimony bolster the court's conclusion regarding Frazee's testimony, and we likewise incorporate those findings by reference here. (*Id.* at 11-14.)

For the reasons stated by the district court, it properly excluded Frazee's testimony on the grounds that it did not satisfy Fed. R. Evid. 702. The court's findings are supported by Frazee's testimony and not clearly erroneous under Fed. R. Evid.104(a).

### 2. Standard Methodologies

SNAPP also argues that Frazee's opinions were based on standard methodologies. Because SNAPP failed to prove that Frazee based his testimony on sufficient facts or data, we need not address the methodologies employed. However, we observe that it would seem that any proper methodology would include intellectual analysis and independent review and verification of the underlying data. *See generally Kumho Tire*, 526 U.S at 152 (stating that the objective of *Daubert's* gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

### 3. Access to Source Documents

As stated and restated, SNAPP's continuously failed to specify which documents supported which damages component and the fact witness who would lay the foundation for that items in question. As proponent of this evidence, the burden was on SNAPP. We hereby incorporate and adopt the district court's holding on this issue found at pages 15-18 of its Order Granting Ford's Motion to Strike SNAPP's Damage Analysis and Related Testimony. (R. 573, Order at 15-18.)

## F. Excluding SNAPP's Business Witnesses

### 1. Vetter's Testimony

SNAPP argues that the district court abused its discretion in ruling that Vetter could not lay a foundation for SNAPP's damages.

Vetter testified that he was SNAPP's consultant and created most of the attachments to the Frazee report. Vetter testified that he did not review any of the data underlying SNAPP's summaries or any of over 900 boxes of documents SNAPP listed as the underlying basis for the summaries. (R. 604, Trans. Apr. 22. 2008, at 28 (Q: "Who put the data and the scanning of the documents together? A. I don't know exactly who did it.")) Vetter's affidavit confirms that he and not Frazee performed the damages calculations. In his affidavit, Vetter stated that he did the calculations for both the damage submissions and the Frazee reports. In his testimony, Vetter acknowledged that he was not familiar with SNAPP's record keeping of the relevant documents, which were created before he became a consultant for SNAPP. (*Id.* at 57, 63-65)

For these reasons, he was not competent to testify as a summary witness or as a witness under Rule 803(6). As the district court stated:

> While Vetter may have made the calculations, there is no evidence he can lay a foundation for the data underlying the analysis because (1) he was not involved in the day-to-day operations of SNAPP, (2) did not create the underlying documents, (3) is not the custodian of the documents, and (4) testified at the hearing that he did not review the underlying documents. Indeed, Vetter's primary role at SNAPP largely did not occur until 1999 and was limited to discrete issues such as the 1999 Agreement, summarizing 1999 audited financial statements, negotiation of the Lease Program Amount, and the I-RaMPP program. Documents allegedly supporting SNAPP's damage claims date back prior to 1999 and involve issues in which Vetter had no direct involvement, such as cost savings processes and documentation and the parties' understanding of the profit target.

(R. 573, Order at 14)  In other words, Vetter was not a qualified witness because he was not familiar with SNAPP's record keeping procedures for the relevant documents, and his reliance was based solely on what he had been told, and not on his knowledge of SNAPP's record keeping procedures.

## 2. Thacker

Thacker admitted that he was not involved in calculating SNAPP's specific damages and lacked personal knowledge about SNAPP's specific damage calculations.  (R. 603, Trans. Apr. 23, 2008, at 168-76; R. 602, Trans. May 5, 2008, at 84-87)[8]  Thus, as the district court found, "Thacker cannot lay the foundation for SNAPP's damages."  (R. 573, Order at 15)

## 3. Other Designated Business Witnesses

As the district court also held, the essence of SNAPP's opposition to Ford's post-hearing motion to strike was that SNAPP would provide more witnesses at trial to present foundational testimony.  As the district court pointed out, this statement shows that SNAPP implicitly conceded that it had failed to provide an adequate foundation for the Frazee report.  (R. 573, Order at 15)  This was more than slightly problematic because SNAPP had been repeatedly ordered by the court to produce that information during discovery.  As the court also pointed out, SNAPP never indicated

---

[8]To wit:
Q: Can you tell me what, if anything, you personally contributed to this exhibit?
A: Nothing as to the numbers per se.  I would have answered his questions about the nature of the agreement and some questions he may have had, but I was not the person who gave him the numbers or helped him with the data.
Q: Who gave him that information?
A: Mr. Vetter.
Q: Do you know where Mr. Vetter got that information from, if he related it to Mr. Frazee?
A: Mr. Vetter has been SNAPP's director and secretary for the last six years or more so he has access to all of SNAPP's data from that point forward, if not prior to that.  So it all comes from SNAPP's records.
(R. 602, Trans. May 5, 2008, at 84)

at the hearing that other witnesses were necessary to provide the factual predicates for Frazee's, Vetter's, and Thacker's testimony.  (*Id.*)

### 4.  Further Steps

SNAPP maintains that it took further steps to demonstrate the foundation for its damages in the form of affidavits from both Thacker and Gary Miller, SNAPP's chief financial officer from 1991-2000.  In rejecting this argument, we incorporate and adopt the court's reasoning at page 10 of its Order Denying SNAPP's Motion for Reconsideration and Offer of Proof at 10.  (R. 593, Order at 10)

### 5.  Striking All of SNAPP's Damages

SNAPP argues that even if the Frazee Study were inadmissible, it presented extensive evidence for (1) Ford's failure to achieve the 1.75% net profit target, (2) Ford's failure to fully compensate SNAPP for savings sharing, (3) Ford's breach of the transition agreement, and (4) Ford's breach of certain lease agreements (the LPA and MELA).

We disagree.  As the district court held, all of these claims also fail because SNAPP failed to identify the specific source documents that it relied on to calculate and support these alleged damages and failed to indicate who would lay the foundation for these claims.

### G. Summary Judgment on Breach of Contract Claim

SNAPP argues that because the district court erred in striking SNAPP's damages evidence, the grant of summary judgment on these grounds was also improper.  In this regard SNAPP asserts that the district court "committed serial error in striking all of Frazee's testimony, all of Thacker's testimony, all of Vetter's testimony, and all of SNAPP's damages."  (SNAPP's Br. at 52)

This court reviews the grant of summary judgment de novo. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is proper where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Proof of damages is an essential element of a breach of contract claim. *See Wolverine Upholstery Co. v. Ammerman*, 135 N.W.2d 572, 575-76 (Mich.Ct.App.1965) (stating that "uncertainty as to the fact of legal damages . . . is fatal to recovery"). *See also ADR N. Am., L.L.C. v. Agway, Inc.*, 303 F.3d 653, 660 (6th Cir.2002) (same; quoting *Wolverine*); *American Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 423 (6th Cir. 1984) ("It is clear that loss of future profits is permitted as an element of damages in breach of contract actions when they can be established with reasonable certainty.").

SNAPP, through Thacker, conceded that its cost savings claim was not based on any denial or refusal of Ford to pay specific claims for cost savings by SNAPP. (R. 602, Trans. May 5, 2008 at 74) As to the 1.75% profit claim, SNAPP, through Vetter, stated that it did not rely on monthly reconciliation forms that allegedly tracked a profit "gap" during the contract. (R. 603, Trans. Apr. 23, 2008, at 53-56) As Ford points out, SNAPP "allocated portions of its total amount of alleged damages to various 'damages components', rather than showing that any damages component was reasonably related to a specific contractual payment obligation." (Ford's Br. at 55) Thus, as Ford asserts, this was fatal to SNAPP's breach of contract claims because it amounted to a failure to prove that SNAPP had been damaged at all, not just the amount of the damages. *See ADR N. Am.*, 303 F.3d at 660 (affirming the district court's grant of summary judgment where the plaintiff had "not produced any method by which the fact of damages could be calculated with reasonable certainty").

More fundamentally, "[t]he party asserting a breach of contract has the burden of proving its

-47-

damages with reasonable certainty . . . ." *Alan Custom Homes, Inc. v. Krol*, 667 N.W.2d 379, 383 (Mich. Ct. App. 2003). Because the district court found SNAPP's damages evidence inadequate and struck it, *see* Order Granting Ford's Motion to Strike SNAPP's Damage Analysis and Related Testimony, (R. 573); disqualified SNAPP's proposed expert/summary witness, Frazee, as well as SNAPP's proffered business witnesses, Vetter and Thacker; and held that SNAPP failed to provide the underlying source documents for its claimed damages; SNAPP cannot make out its breach of contract claim. Summary judgment was proper.

### H. Summary Judgment on Tortious Interference Claim

SNAPP contends that Ford interfered with SNAPP's bidding on a procurement contract with Covisint, a joint venture between Ford, GM, and other automotive manufacturers. Covisint was essentially a marketing and sales company of procurement services.

In March 1999, Thacker created and incorporated a company called Direct Sourcing Solutions, Inc. (Direct Sourcing). SNAPP claims it used Direct Sourcing because it feared that Ford was blacklisting it from the auto industry. SNAPP states that Direct Sourcing was 50% owned by SNAPP and 50% owned by Thacker. SNAPP claims that Direct Sourcing never had employees and contracted with SNAPP for the services necessary to conduct its business with GM.

In late 1999, SNAPP and GM invested significant resources so that SNAPP could install and manage a steel resale program for GM.

In late December 1999 and early 2000, SNAPP sold its software and related documentation, computers and furniture and assets to Direct Sourcing.

In May 2000, GM and Direct Sourcing signed a letter of intent to work together exclusively on "the potential formation of a new business entity ('Venture 1') . . . to provide an internet based

management and administrative service for steel resale and other commodities to GM ('Project')."

(R. 487-7)

SNAPP's claim is based on a conversation in September 2000, between Alice Miles of Ford and Raymond Pollard of GM, both of whom were working on making Covisint operational. Pollard testified in his deposition that Miles said "there is no way Ford would ever support us doing any business with any company owned by . . . Bhagwan Thacker." (R. 487-3, Raymond Pollard Dep., Ledbetter v. Thacker, Nov. 26, 2001, at 54)[9] SNAPP contends that, as a result, GM did not consummate the Venture 1 business relationship and began working exclusively through Covisint in February 2000, for its outsourced purchasing services. SNAPP further claims Ford interfered with its business expectancy of providing outsourcing purchasing services to Covisint.

The district court dismissed the claim because (1) there was no evidence that SNAPP attempted to do business with GM after January 1, 2000, when Direct Sourcing began doing business with GM; (2) there was no evidence that Ford had interfered with SNAPP doing business with GM; (3) there was no evidence that SNAPP attempted, or was in a position, to do business with Covisint after January 1, 2001; and (4) there was no evidence that Covisint engaged in the type of business which SNAPP performed for Ford or that Covisint ever considered SNAPP as a vendor. (R. 500, Decision and Order Dismissing SNAPP's Tortious Interference Claim dated June 20, 2007, at 6)

---

[9]SNAPP claims a subsequent affidavit from Pollard contradicts this testimony. (R. 226-7, Pollard Aug. 22, 2005, Declaration.) However, Pollard merely stated that working for Covisint, he discussed Direct Sourcing with Miles and told her that Direct Sourcing was working for GM and desired to do the same for Covisint. He also stated that "[t]o the best that I can remember, there was never any discussion or suggestion that [Direct Sourcing] would provide to, or work with Covisint in marketing any e-procurement services or other e-services." (*Id*. at 2)

Under Michigan law, the elements of a tortious interference claim are (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant. *Tata Consultancy Servs. v. Sys. Int'l, Inc.*, 31 F.3d 416, 422 (6th Cir.1994) (quoting *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 462 (Mich. Ct. App. 1989)).

SNAPP claims the district court erred because the only reason it went out of business was due to Ford's tortious interference. SNAPP's claim fails because it did not have a prospective relationship with GM or Covisint after January 2000. While it alleges that Direct Sourcing is a sister company, SNAPP's counsel admitted to the special master that as of February 22, 2000, the bulk of SNAPP's assets had been transferred to Direct Sourcing and that SNAPP had stopped doing substantial business. (R. 473-20, Trans. Apr. 25, 2006, at 86-87) Further, on October 2, 2000, Direct Sourcing's counsel sent a letter to Ford's Office of General Counsel, which states: "As you are no doubt aware, Direct Sourcing Solutions, Inc. ("DSSI") has sought to become a provider of services to Covisint" and that "there is no commonality of ownership between the SNAPP and DSSI." (R. 473-22, Oct. 2, 2000, Letter from SNAPP's counsel Michael Nedelman to Ford Office of General Counsel.)

Ford's veto of Direct Sourcing was not actionable interference, because Ford was a joint venturer and not a third party vis-a-vis any purported business relationship between SNAPP and Covisint. *See Dzierwa v. Michigan Oil Co.*, 393 N.W.2d 610, 613 (Mich. Ct. App. 1986) (stating that to maintain a cause of action, the plaintiff must establish that the defendant caused a breach of contract and that the defendant was a "third party" to the contract or business relationship). And, SNAPP never had a contract with Covisint. Nor did Direct Sourcing have a contract with GM. As to the Venture 1 business relationship, the letter of intent expressly states that is was "non-binding

-50-

and [did] not constitute any obligation or commitment by either party to enter into any transaction, partnership, venture or transfer of technology." (R. 475-4 at 2-3)

### III. Conclusion

Having reviewed de novo the record below, and considered all of SNAPP's arguments on appeal, we AFFIRM the judgment of the district court, for the reasons stated herein, as well as those stated in the following opinions of the district court, which we incorporate and adopt by reference:

(1) Decision and Order Dismissing SNAPP's Tortious Interference Claim, dated June 20, 2007 (R. 500);

(2) Order Granting Ford's Motion to Strike SNAPP's Damage Analysis and Related Testimony, dated December 23, 2008 (R.573);

(3) Order Denying SNAPP's Motion for Reconsideration and Offer of Proof, dated March 9, 2009 (R. 593); and

(4) Memorandum and Order Granting Summary Judgment for Ford Motor Company and Dismissing Case, dated May 26, 2009 (R. 597).